**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK**
_____

**JOSEPH MIGUEL DAMARVILLE,**

                    **Plaintiff pro se,**

         **v.**                                                    **5:11-CV-1050
                                                                   (NAM/ATB)**


**SYRACUSE CITY SCHOOL DISTRICT,
ANNE SANSONE,[1] Assistant Director Personnel,
in her Official and Individual Capacities, and
Principal, CORLISS HERR, in her official and
individual capacities.**

                    **Defendants.**

_____

**APPEARANCES:**                                    **OF COUNSEL:**

Joseph Miguel Damarville, Pro se
Syracuse, New York

Ferrara, Fiorenza, Larrison, Barrett & Reitz, P.C.        Charles E. Symons, Esq.
5010 Campuswood Drive
East Syracuse, New York 13057

**Norman A. Mordue, U.S. District Judge**

**MEMORANDUM DECISION AND ORDER**

**I.      INTRODUCTION**

         Plaintiff pro se Joseph Miguel Damarville, an African American, brings this action

against defendants, Syracuse City School District, Ann Sanzone, and Corliss Herr, pursuant to

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e , 42 U.S.C. § 1981, and the New

York State Human Rights Law ("NYSHRL"), N.Y. EXEC. LAW § 290, alleging discrimination

---

         [1]This is how it is spelled in the complaint.  In her affidavit, she spells her name Ann
Sanzone.  The Court will use this spelling.

based on race.  The facts of this case arise from plaintiff's employment (from September 2006 to March 2009) as a teacher's assistant at Bellevue Middle School Academy ("Bellevue")[2] in the Syracuse City School District.  Plaintiff brings causes of action for: (1) hostile work environment in violation of Title VII and the NYSHRL; (2) disparate treatment and discrimination in violation of Title VII, 42 U.S.C. § 1981and the NYSHRL; and (3) retaliation in violation of Title VII and the NYSHRL.  Presently before the Court is defendants' motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.[3]  Plaintiff opposes this motion and requests that the Court appoint an attorney to represent him.

## II.   PROCEDURAL HISTORY

In May 2009, plaintiff filed a complaint against the District with the Equal Employment Opportunity Commission ("EEOC") alleging discrimination based on race.  On July 19, 2009, plaintiff filed a verified complaint against the District with the New York State Division of Human Rights ("NYSDHR") charging "unlawful discriminatory practice relating to employment because of race/color".

On October 4, 2010, an administrative hearing was held at the NYSDHR before Administrative Law Judge Michael T. Groben.  Plaintiff and the District were represented by counsel.  Plaintiff, Sandra Montoyo, Margaret Morone-Wilson, Anthony Williams, Corliss Herr, and Ann Sanzone testified.  On February 5, 2011, the ALJ issued a decision dismissing the complaint on the ground that plaintiff failed to prove by a preponderance of the evidence that the

---

[2]Previously named James A. Shea Middle School.

[3]Defendants served plaintiff with a copy of the "Notification of the Consequences of Failing to Respond to a Summary Judgment Motion" as required by the Rule 56.2 of Local Rules of the Northern District of New York.  Dkt. No. 15-1.

District terminated his employment because of his race and color.  On April 14, 2011, Galen D. Kirkland, Commissioner of the NYSDHR, issued a "Notice and Final Order" which stated that the parties' objections had been reviewed and that the ALJ's decision was "adopted and issued by [the Commissioner] as the final order" of the NYSDHR.

On June 3, 2011, the EEOC issued a "Dismissal and Notice of Rights", which stated that the "EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge" and advised plaintiff that any lawsuit must be filed within ninety days. Compl., Ex. A.  On September 2, 2011, plaintiff commenced this action.

**III.   EVIDENCE**

In support of their motion for summary judgment, defendants submitted: a transcript of the administrative hearing before the ALJ; an affidavit from Michael Sorrell, the Director of Staff Relations for the District; and an affidavit and exhibits from Sanzone, the Assistant Director of Personnel for the District.  In response, plaintiff submitted: a preliminary statement; his undated letter to the District regarding the incident in his classroom on March 4, 2009; his "Review of Meeting, Dated May 19, 2008"; a letter dated March 17, 2009 from Nancy Juliano to Ann Sanzone regarding plaintiff; "plaintiff's response to Ann D'Amico letter dated April 3, 2009"; a letter dated April 12, 2011, from Lawrence J. Zyra, Esq., who represented plaintiff before the NYSDHR, objecting to the ALJ's decision; Principal Margaret Morone-Wilson's June 21, 2007, evaluation of plaintiff's job performance; Principal Anthony Williams's May 27, 2008, evaluation of plaintiff's job performance; a "Draft Copy" by Officer Jimmie Johnson of the Syracuse Police Department regarding an incident in plaintiff's classroom on March 4, 2009; a decision dated September 11, 2009 by the State of New York Unemployment Insurance Appeal

3

Board overruling the "initial determination, disqualifying the claimant from receiving benefits" as well as two letters by plaintiff to the New York State Department of Labor; an email dated September 17, 2008, from Lisa Friedman Clark regarding plaintiff's honesty and trustworthiness; plaintiff's verified answer to defendants' answer; plaintiff's affidavit/statement of material facts; and a transcript of the administrative hearing.

## IV.    FACTUAL BACKGROUND

Unless otherwise noted, the following facts are from the transcript of the hearing before the Division of Human Rights.  In September 2006, the District hired plaintiff as a teacher's assistant at Bellevue, a middle school (grades six, seven and eight), in Syracuse, New York. Plaintiff's position was probationary for three years, after which, District administrators would decide whether to offer plaintiff tenure.  Plaintiff was assigned to supervise students from 8:00 a.m. to 3:00 p.m., in the in-school suspension ("ISS") room, which was in a trailer adjacent to the school building.  The trailer had two rooms and two bathrooms.  During the time material to this action, the "Pathways Program", an after-school program, occupied the other room in the trailer.  Plaintiff explained that his responsibilities in the ISS room were to monitor, tutor and help the students with their work so that they could return to their regular classroom.

Margaret Morone-Wilson was the Bellevue principal during the 2006-2007 school year. Principal Morone-Wilson testified that on or about January 31, 2007, she authorized the vice principal, Lynell Francis, to issue plaintiff a memorandum regarding "some ongoing issues about . . . his schedule" and to make "sure students are in [ISS] for the period that administrators approve."  Principal Morone-Wilson stated that the memorandum also addressed plaintiff's lunch breaks and how they would be covered.  Plaintiff testified that he never received this

memorandum and that he had no recollection of "having a conversation within anyone in administration in January of 2007 with regard to" his job "expectations".

According to plaintiff, in April 2007, he spoke to Principal Morone-Wilson [4] about his schedule and told her that he was a single dad and had to take his son to school.  So, "to help him with arriving at work on time", Principal Morone-Wilson assigned plaintiff to supervise after-school detention and changed his schedule to 8:30 a.m. - 3:30 p.m.[5]  Principal Morone-Wilson testified that even after changing plaintiff's schedule, there were "incidents" involving his lunch break and his "start" time.  As a result, on or about April 7, 2007, Principal Morone-Wilson issued plaintiff a memorandum "reiterating the start time" and noting that "he was late to work again".  Principal Morone-Wilson testified that she was concerned because it was "three quarters into the first year of the probationary year and we're still having conversations about start time and end times and . . . schedules".

Plaintiff testified that on or about May 21, 2007 he gave Principal Morone-Wilson a written request to leave early on May 23, 2007.  Plaintiff stated that he explained to Principal Morone-Wilson that he needed to leave early to attend a meeting at his son's school and that she approved his request.  Plaintiff testified that on May 23, 2007, "no one [was] available when it was time for me to leave, so I spoke to the secretary and I told the secretary that the request is in, please remind . . . Ms. Wilson that I had to leave" and "did not take a lunch or break, so I will not be returning."

---

[4]Wilson was principal during the 2006-2007 school year.

[5]Wilson testified that plaintiff's hours changed sometime between September and December 2006.

On May 24, 2007, Principal Morone-Wilson issued plaintiff a memorandum noting his failure to return to work the day before to perform his after-school duties. Principal Morone-Wilson stated that she also included plaintiff's school responsibilities in the memorandum "because those are the ongoing conversations that we were having and that . . . we were still having from . . . throughout the school year about how things are to function and what the procedures are going to be for the job responsibilities."  Principal Morone-Wilson testified that she also addressed the issue of cell phone use in the memorandum because plaintiff would:

> be on his cell phone throughout the day at different points, and when we had prior conversations . . . he wanted his son's teachers to access to him but he's also in charge of supervising other kids.  So that's not an appropriate time to take those phone calls, that they can come through the main office.

Principal Morone-Wilson stated that while she acknowledged that plaintiff had "gone above and beyond" by mentoring students after school, she also reminded him of "the basic things that have to happen during the school day like when we use our cell phones, when we arrive to work, when we leave for our lunch breaks . . ."   Principal Morone-Wilson testified that she met with plaintiff to discuss this issue and explained that while plaintiff had "notified the secretary that he was taking a half hour lunch at 2:20" , he had failed to return to work for his after-school duties.

Plaintiff testified that when he spoke to Principal Morone-Wilson, he explained that he "did not take a lunch that day or a 15 minute break" and reminded her that he had filled out a form requesting to leave early and that she had granted his request.  According to plaintiff, Principal Morone-Wilson responded that she "would correct it".  Plaintiff testified that he had no conversations with Principal Morone-Wilson about cell phone use.

On June 21, 2007, Principal Morone-Wilson issued plaintiff's performance evaluation. The possible ratings were unsatisfactory, satisfactory, good, or excellent.  Plaintiff received

6

satisfactory or good ratings in every area.  Principal Morone-Wilson commented that plaintiff was "eager to mentor students and to improve the schools [sic] functioning in order to ensure student success."  Principal Morone-Wilson noted that plaintiff had: "many demands on his time since he is also a coordinator of an SES program" and that "[h]e needs to manage all these responsibilities in a manner that does not impact the regular job expectations and contractual requirements."  Principal Morone-Wilson recommended "continued service or tenure" for plaintiff.

Anthony Williams was the principal of Bellevue during the 2007-2008 school year. Regarding plaintiff's schedule, Principal Williams explained:

> We had talked in the very beginning of the year about when he was expected to be there . . . it really needed clarification because the agreement that he had and I had was that he could come late because he had to take care of some issue with his own child on a regular basis.  So we agreed that if . . . he would come late, then he could leave late; and as a result of him leaving late, he could also do detention after school if we wanted some kids to stay after school.

Principal Williams testified that on October 26, 2007 he issued plaintiff a memorandum because he was late to work.  The memorandum also outlined plaintiff's responsibilities. Principal Williams testified that although plaintiff had been late to work prior to October 26, 2007, he "didn't start keeping track of it until I kind of noticed that it was a problem."  Plaintiff testified that he had been twenty to thirty minutes late that morning and that Principal Williams said "[y]our work day starts at 8:45" and that he needed to "be here at 8:45".  Plaintiff responded that it was his "first time late" and it would not "happen again."

On or about March 26, 2008, Principal Williams issued plaintiff a memorandum summarizing a meeting they had on March 25, 2008.  Plaintiff testified that during the meeting, they discussed two parents who "came into me . . .about their . . . sons' attendance or being sent

7

to ISS." Plaintiff told Principal Williams that Doreen Bronchetti,[6] had given him permission to speak with the parents. Plaintiff testified that Principal Williams also accused him of allowing "a couple of kids" to leave early and that he had denied the accusation and told Principal Williams that "[m]ost times . . . kids will not show up to the room." Principal Williams testified that other concerns led to the meeting, including plaintiff's lateness to work and comments to administrators "about whether he felt [the students] should have been in [ISS] that long or . . . whether it's not working . . . questioning our administrative decision". Principal Williams told plaintiff that he "was to send any parent to us so we could talk about why we made the decision that we did and why we felt that [ISS] was the best course of action in terms of a consequence for that student."

On or about May 16, 2008, plaintiff met with Principal Williams, Bronchetti, and John Donato, plaintiff's union representative. Plaintiff testified that at the meeting, he raised the issue about the number of students in the room because the fire "code paper said 18 to 22 kids" but that "at times" he had thirty, forty, or fifty students in the room. Plaintiff told Bronchetti and Principal Williams that "sometimes its unbearing [sic] and . . . I have to use both rooms sometimes if the other programs are not there and is it possible I could get some help" or "do something else with the other students . . . but it was just totally ignored." According to plaintiff, they "just basically said don't question the decisions being made." Plaintiff testified that at the meeting "[w]e discussed the fact that many times that Ms. Bronchetti, . . . she said she sent the kids down, the kids would come back to her." Plaintiff stated that they also "spoke about the fact that the kids would never show up to the trailer and they were probably wandering around

---

[6]Bronchetti was an "administrative intern" who was one of plaintiff's supervisors.

the building and I just never received them or they left."  Plaintiff stated that they also discussed an incident when Bronchetti called him on the walkie talkie during a fire drill "and it was so loud I did not hear" the walkie talkie.  Plaintiff explained that principal Williams was standing next to him and that when they went to Bronchetti's office "she said she was calling me, and I told her I was with Mr. Williams at the fire drill and . . . he could definitely explain to you I was with him . . . at the fire drill."  Plaintiff stated that Principal Williams "just laughed about" it and "never told her anything."

On May 19, 2008, Bronchetti issued plaintiff a memorandum summarizing the May 16, 2008, meeting.  The memorandum states:

> At the meeting, the following was discussed:
>
> You had expressed concern about communications regarding assignments of students to [ISS] last week.  On the particular day, I noted my frustration of trying to set up placement of six students, during a 15 minute period.  This was difficult, since I called 9 times on the walkie talkie during a 15 minute period, and did not receive an answer from you until Mr. Williams was with you. (This has been addressed, with you being diligent about responding in a timely manner on the walkie talkie.  Also, I stated that I had taken Mr. Williams' and Mr. Donato's suggestions that I write down how long students need to stay in [ISS].
>
> It was also discussed that Mr. Williams, [Vice Principal Corliss] Herr and I have all had problems with receiving a response from you on the walkie talkie on some occasions.  (It was mentioned that just the other day, Mr. Herr tried for 15 minutes to contact you on the walkie talkie.  In fact, she had to all-call you in the building to make contact.)
>
> I also mentioned a concern at this meeting.  On a few occasions, it seemed that you were questioning my decisions about assigning students to [ISS].  On the last time, the student was in my office when you said, "He was with me yesterday and the other day and it isn't working" I felt that you were questioning my judgment.  (In fact, I was aware that this student had committed a serious offense.  I had not been able to reach the parent, so I couldn't send him home."
>
> I also mentioned that it is common in all schools for some students to frequently be in the [ISS].  I mentioned that part of your job is to work with students who are

frequently with you to held change their behaviors.  I also mentioned that neither of us controls who gets sent to the office on referrals, we just work with them when they come.  I mentioned some of the things that I have done with students to try to change their behaviors, including: counseling, mediation[], parent meetings and student conferences.

You stated that you respect everyone.  I stated that I did not always feel respected by you.

Mr. Williams reminded you that I am your supervisor, and that you should act accordingly.

I also stated a concern about students being sent out of [ISS] shortly after they are assigned there.  (You explained that you had to set a tone in the room.)  When a student must be sent out of [ISS], a referral needs to be written.  Previously Mr. Williams, Ms. Herr and I have asked that you write a referral on any child that you send out of [ISS].  This is because we need documentation of where our students are at all times."  It was also discussed that when students were sent back to the office, that you need to notify the office and wait for a response before sending the students.  As of this meeting, I had not yet received a referral on the student who was sent out on the previous day, even though I had requested it.  On that occasion, I did not know that he was out of [ISS] and he was found wandering around the halls.  There have been other students who were sent back to the office, but they wandered the halls instead of going to the office.  This is a safety concern.

It was also noted that sometimes, especially when I am supervising 130 students in the lunchroom, it becomes difficult when students are sent back to me.

You and Mr. Donato mentioned that it was difficult to have 30 students in the room.  I mentioned that this was not common.  However, it if was the case, we could send over a hall monitor to help supervise the students.  (After the meeting, I reviewed the [ISS] attendance sheets and noted that on May 15, there were a total of 26 students in the room during the whole day.  Only one was there all day.  On May 16, there were 26 students for the entire day, some of whom were there for only one half hour.)

As a result of this meeting:

You are asked to keep your walkie-talkie turned up so that you can hear administrators calling.  You are also asked to respond promptly.

The administrators agreed to respond back to you whenever possible.  If you get no response, you can buzz the office with your call button.

To prevent misunderstandings, whenever possible, I will write down the amount of time that students are assigned to [ISS].

For safety reasons, if you need to send students out of [ISS], you need to call and wait for confirmation from an administrator or the office before sending students out of the room.

If you disagree with an administrative decision, you are asked to express your opinions to the administrator privately, not in the student's presence.

If you feel there are too many students in the room, please call the office and we will send someone to assist you.

Attached as Exhibit B to plaintiff's response to defendants' motion for summary judgment is the following written statement regarding the May 16, 2008 meeting, which states, in relevant part:

On the day in question, when Ms. Bronchetti called on the hand held two way radio. . . . . Plantiff was assisting Mr. Williams monitor students in a fire drill. Plaintiff did not hear Ms. Bronchetti call. Once again Mr. Williams failed to communicate such with Ms. Bronchetti, he laughed when he was asked to explain Plaintiff's whereabouts too [sic] Ms. Bronchetti.

Please note, Mr. Daniel Donator [sic] Union Building Rep was present at the meeting. He told Ms. Bronchetti to confirm Plaintiffs [sic] whereabouts with Mr. Williams, she ignored the Union Rep's request.

On or about May 27, 2008, Vice Principal Herr prepared plaintiff's 2007-2008 performance evaluation. Vice Principal Herr testified that there were concerns regarding plaintiff's "attendance and coming late and his questioning of administration when students were placed in [ISS]." Vice Principal Herr explained that even though Principal Williams gave plaintiff a later start time, "he still, many times, wasn't coming in till 9:00" and the "kids would sit in the office and we would wait for [plaintiff] to arrive." Plaintiff received ratings of satisfactory, good, and excellent ratings in the performance evaluation. Vice Principal Herr commented that plaintiff :

11

has developed some good relationships with students.  He does mentor students and has offered his time after school to work with students.  He ensures that students are learning while in IS[S] by providing work in both reading and math for students who attend IS[S] without work or finish before the block is over.

Vice Principal Herr also commented that plaintiff "has been late to work and has been spoken to and received 2 memos in regards to this.  At times [plaintiff] has questioned administration in regard to the placing of certain students in IS[S]."  Regarding alternative suggestions that "have been made to the employee to help him . . . alleviate these concerns", Vice Principal Herr wrote:

His agreed upon start time begins at 8:45, and he stays until 3:45 to provide detention for students to make up for the 45 minutes.  We depend on [plaintiff] and it is necessary for him to be in school at the time designated.  Per the memos written on March 26th and May 19th, he has been reminded he is to take students into IS[S] without question of administration.

Vice Principal Herr recommended "continued service or tenure" for plaintiff.  Vice Principal Herr explained that she and Principal Williams had discussed whether to recommend that plaintiff continue as a teacher's assistant during the next school year and that Principal Williams "decided to give [plaintiff] another year to try to make some changes with the attendance and how he dealt with administration."  Principal Williams testified that he recommended that plaintiff's employment be continued because he was being "nice" though he "did have concerns".

On or about June 4, 2008, Principal Williams informed plaintiff that he would be expected to work 8:00 a.m. to 3:00 p.m. during the next school year.

Principal Herr was Bellevue's principal during the 2008/2009 school year.  In the fall of 2008, she discussed attendance with plaintiff because "many times" she was "looking for him in the morning, he hadn't arrived, kids were sitting in ISS and sometimes they would run out of the office because ISS wasn't open yet."  Plaintiff asked if he could change his schedule and

Principal Herr agreed to allow him to come in late and stay late two days a week.  Plaintiff testified that he never spoke with Principal Herr about his alleged tardiness to work in October 2008.

In February 2009, Principal Herr gave a "counseling memo" to plaintiff because he "left the building without telling anyone before school was over".  In the memorandum, Principal Herr noted that plaintiff left staff development training an hour early.  She also included a reminder that "he needed to be to school on time" because "he had been coming late again".  During a discussion of the incident, Principal Herr told plaintiff "[t]hat we had looked for him after the break, that we had paged him, [and] could not find him."  Principal Herr stated that plaintiff acknowledged that he left early and apologized.

Plaintiff disputes this allegation and stated that he attended the half day staff development day for the "entire one half of the day".  Plaintiff testified that although there is a memorandum from Principal Herr in the record regarding a conversation they allegedly had on February 22, 2009, he did not speak with her on that date and never received that memorandum.  Plaintiff denied the allegation entirely and testified that he never had any conversations with Principal Herr about being late to school.

Plaintiff testified that on March 5, 2009, around 11:00 a.m., R.A., a seventh grade student, was sent to his room.  Plaintiff stated that he knew R.A., who was the same age as his own son, and that he treated him "as a son".  Plaintiff explained that R.A. "communicated with me better than he communicated with any other teacher or Teacher's Assistant or even the principal".

Plaintiff testified that at approximately 2:15, "another young man, Mr. Kenny Pace from

13

the other side of the trailer walked in."[7]  Plaintiff stated that when R.A. saw Pace, "he punched [Pace] in the chest, and []Pace flinched at him".[8]  Plaintiff testified that R.A. "ran towards the bathroom door and then . . . when he tried opening the door, he hit the door and then he ran right through."  Plaintiff stated that R.A.'s upper body and face came into contact with the door.  According to plaintiff, Pace exited the room and "went back to the other side of his trailer."

Plaintiff testified that there were "about 30" students in his room that day and that they were laughing after R.A. went through the bathroom door, so plaintiff "attempted to calm the kids down and had everybody get back to work."  After a "two or three minutes", R.A. walked out of the bathroom "with water all over his face".  Plaintiff sat him down and asked "if he was okay".  Plaintiff stated that R.A. responded that he was fine.  Plaintiff gave R.A. work to do "and the bell rang a few minutes after."  Plaintiff testified that R.A. had no visible signs of injury on his face and made no comment "with respect to anything []Pace might have done."  Plaintiff stated that none of the students indicated to him that they "had heard anything unusual going on in the bathroom" and that there were no other teachers or assistants in the room that day.[9]

---

[7]Plaintiff testified that Pace was twenty-six or twenty-seven years old and worked in the program that occupied the other room in the trailer.

[8]Plaintiff explained that R.A.'s behavior was "just []R.A.'s norm" and that he would run up to "a lot of adults in the school" and "tap them."  Plaintiff stated that R.A. did the same to Pace "and that was it."

[9]A second version of the incident:

Sandra Montoyo testified that in March 2009, she was working at Bellevue Middle School Academy in an after school program run by Catholic Charities.  On March 5, 2009, Montoyo was in the room on the other side of the trailer that housed the ISS room.  Montoyo stated that on that day she saw:

this little boy, he was running through the hallway - - and in between both trailer [sic] it is the bathroom - - girls and boys bathroom.  So he was running and tried to get into the boys bathroom, and Mr. Kenny put his foot and push it, get himself inside with the boy.

14

Principal Herr testified that on or about March 5, 2009, R.A. and his father came to see her.  She stated that R.A.'s father  "was extremely mad and upset" because "[h]is son had come home" with a "swollen" and "black and blue" eye.  Principal Herr testified that R.A. told her that "Kenny had punched him in the eye."  Principal Herr turned the investigation over to the school's police officer, Jimmy Johnson.

Plaintiff testified that the next day, Principal Herr called him to the office and informed him that there had been "an incident in the bathroom" between Pace and R.A. in his classroom.  Plaintiff responded that there had been an incident and explained "that R.A. got . . . up and out of – not out of his norm, he got up and playfully . . . hit Mr. Pace in the chest."  Plaintiff told Principal Herr that  R.A. "was upset" when he exited the bathroom, so plaintiff "sat him down in the desk and it was . . . three or four minutes till he went home."  Principal Herr asked plaintiff "why he didn't come and let me know something had happened to the child."  Plaintiff responded that R.A. "was upset but he didn't realize anything had happened to him."

According to plaintiff, when Principal Herr asked if he was "sure that's what happened",

---

. . . .

So I saw R.A. running and tried to close the do[or] behind him, but at the same time Mr. Kenny was really close to him.  He hold the door, . . . they both keep running to the boys bathroom.  And then he tried to do the same thing again; close the door behind him but Mr. Kenny . . . stopped the door, push it and get himself in there.

Montoyo testified that Pace and R.A. were in the bathroom for a "few minutes" but she heard nothing.  Montoyo observed both individuals exit the bathroom and heard Pace say to R.A.: "That's going to teach you to keep your hands to yourself."  Montoyo stated that she saw no signs of injury on R.A., who returned to the ISS room.  A "little bit" later, Montoyo reported the incident to her boss, who happened to be there that day.  Montoyo's boss did not speak to anyone in the school about the incident.  The next day, the school's police officer and Principal Herr  spoke with her about the incident.

15

he replied, "that's exactly what happened."  Plaintiff testified that he believed that Principal Herr wanted him to "change his story".  Plaintiff stated that Principal Herr then told him that R.A. arrived at school with "a swollen eye" and "said that . . . Pace hit him in the bathroom" and that R.A. was crying when he came out of the bathroom.

Principal Herr testified that she had talked to some of the students who had been in plaintiff's room during the incident and that, at first, they told her that R.A. "ran into a door" and a wall.  Principal Herr stated that when she spoke with the students the next day, their story had "changed", and that they told her that after R.A. went into the bathroom they heard "something to the effect that 'You're not going to hit a grown man again' and they heard some banging," and when R.A. came out of the bathroom, he was crying.  Principal Herr asked plaintiff if his story was "going to stay as it was" or "did he remember anything else".

Principal Herr testified that after sending a report of the incident to Ann Sanzone, the District's assistant director of personnel, she received a "a phone call . . . that [she] was supposed to tell [plaintiff] to leave the premises and he would be suspended with pay."  That day, March 6, 2009, plaintiff was placed on administrative suspension.  Plaintiff testified that Principal Herr told him that it was "procedure" and that he was being suspended because the incident took place in his room.

In a letter to plaintiff dated March 16, 2009, Superintendent Daniel G. Lowengard wrote:

> Please be advised that, in accordance with Section 3031 of the Education law of the State of New York, I will make a recommendation to the Board of Education at its meeting to be held on April 22, 2009, that your services as a probationary Teaching Assistant with the Syracuse City School District be discontinued.  If such recommendation is approved, your services will be terminated effective at the close of day on May 15, 2009.

> In accordance with the above-referenced section of Education Law, you have

16

the right to request in writing that you be furnished with a written statement setting forth the reasons for my recommendation . . . .

Please be further advised that you may file, if you choose, a written response to the statement of reasons. This written response must be filed . . . prior to the date of the Board meeting . . . .

Nancy Juliano, plaintiff's union representative, wrote a letter to Sanzone on plaintiff's behalf. The letter is dated March 17, 2009, and states:

I am attaching Miguel's statement regarding the incident on March 4, 2009.

I am also respectfully requesting further consideration. I believe his termination is extremely unfair and arbitrary. I believe he was terminated because the parent was upset. Miguel did not touch the student. Miguel has a very good relationship with the student. The administrator often sent the student to Miguel because his teacher couldn't handle him. I believe that Miguel was sacrificed because the person that allegedly touched him isn't a district employee so he couldn't be "fired". Probably terminating Miguel provides some satisfaction for the student's father.

Miguel is the epitome of mentor, good example, role model . . . all of those things that we want for our students. He wanted to become a teacher and administrator. His dreams were thrown in the trash; he is very frustrated and disillusioned.

Miguel related what he saw. It is really disturbing that his accounting of the incident is dismissed and deemed not truthful. The truth is that there has been a tremendous concern about the lack of discipline, control and follow through in that school.

I spent a lot of time reading the information you gave me yesterday. There is a story behind every piece of paper. The police officer stated that he saw the student about 15 minutes after the alleged incident and DID NOT notice any injuries. The student's father DID NOT notice any injury when his son came home. The father said his son's eye was bruised and swollen when he got up from a nap.

Ms. Herr's memo to you regarding the incident should be correctly dated March 6, 2009. As indicated in Miguel's statement, in the entire time he has worked with this student, he has never been given the opportunity to read the student's IEP, nor was he aware the student had any medical issues.

Miguel never received the memo from Ms. Herr dated February 2, 2009. The memo dated June 4, 2008 was simply informative - - not disciplinary in any way. On his May 27, 2008 evaluation Ms. Herr recommended continuation. The memo of May 19, 2008 from Ms. Bronchetti was written after he went to her with concerns about the difficulty he was experiencing because of the number of students in ISS which necessitated he try to monitor them from the center of the space (ISS is in the

trailer).

        Mr. William's memo of March 26, 2008 is more disturbing in that it is not an accurate retelling of the circumstances.  Miguel did not release students from ISS early- they never came to ISS.  Mr. William's [sic] sent the students to ISS with a pass - they chose not to go to ISS.  They were not escorted nor was Miguel notified to expect them.

        The memo from Margaret Monroe-Wilson dated May 24, 2007 seems to serve as clarification more than anything else.  Read the positive comments.  Mr. Williams addressed tardiness in his October 26, 2007 memo.  The evaluation of June 21, 2007 is acceptable and Ms. Monroe-Wilson recommended continuance.  The memo dated April 4, 2007 is simply communication-again-not disciplinary.  Miguel did not receive the memo dated January 31, 2007 from the Administrative Team; it isn't disciplinary either.

        I apologize for the length of this memo, but not for passion I feel about Miguel's termination.  It is unfair and arbitrary.

        Please reconsider your decision.

Plaintiff testified that a hearing was held in March 2009 but that no one testified and, to his knowledge, no proof was presented except for the above letter.  After the hearing, plaintiff learned that he "would have 60 days" and then be dismissed.

Plaintiff submitted a written request for the reasons for his dismissal.  In a letter to plaintiff dated April 3, 2009, Superintendent Lowengard, responded:

        This letter is in response to your letter to Ann D'Amico, District Clerk, Board of Education . . . in which you asked for the reason(s) for the recommendation that your probationary period be terminated.

        The recommendation for termination of your probationary period was based on your failure to meet the following performance standards:

1.     Failure to work your contractual hours and be punctual in reporting to work.
2.     Failure to follow procedures for signing out of the building - leaving without permission and not returning.
3.     Failure to follow the directives of an administrator.
4.     Failure to follow proper procedures for reporting a student injury.
5.     Failure to follow building procedures for cell phone usage.
6.     Failure to supervise ISS students at all times allowing them to walk in the halls unescorted.

Plaintiff testified that after receiving the letter containing the reasons for the termination

of his employment, he requested and received a meeting with Superintendent Lowengard. Sanzone also attended the meeting. At the meeting, plaintiff expressed his disagreement with the letter and told Superintendent Lowengard that the reasons in the letter "were false" and that he did not know R.A. had been injured but had he known, he "definitely [would] report it."

One of plaintiff's claims is that the District treated him differently than a similarly situated white teacher, John Shehadi,[10] and that different treatment is evidence of the District's race-based discrimination. During the administrative hearing, plaintiff's attorney asked what the basis was for his allegation that the District's motivation for terminating plaintiff's employment was. Plaintiff responded:

> Sir . . . it's very clear that I was terminated because of my race. The reason why, you know; it's my belief and to my understanding that another teacher, Mr. [John] Shehadi . . . was involved in a more severe incident that I was in that particular school a year prior to . . . the incident that I was named to be . . . involved in, and received a . . . tap on the wrist - - slap on the wrist. He actually, And, to my understanding did push/shove the student and slam the student's finger in the door, and he received a - - 30 day suspension. Where I, for an incident I had no involvement in, received a dismissal.
> . . . .
>
> I was held to a different standard than Mr. Shehadi. Mr. Shehadi was given a slap on the wrist, a 30-day suspension with his job back; and based on what he did, which was a severe assault on a kid. And me, in my instance, I had nothing to do with the situation and I . . . got dismissed.
> . . . .
>
> And it's also to . . . my understanding that . . . the year I was dismissed that every other teacher and teacher assistant in that . . . particular school which was white received tenure that year.

Principal Williams testified that John Shehadi, who is white, was a sixth grade math teacher at Bellevue. Principal Williams stated that he did Shehadi's evaluations and eventually

---

[10]Plaintiff testified that he did not know and had not worked with Shehadi.

recommended him for tenure.  Principal Williams stated that Shehadi's performance was "good" and that he "developed good relationships with students" and "did his lesson plans."  Principal Williams testified that he "particularly liked how . . . . [w]hen we would do professional development, he would incorporate it into his lessons" in a relatively short period of time.

Principal Williams stated that, like plaintiff, Shehadi had an incident involving a student in his classroom during his probationary period.  Principal Williams testified that a student was being disruptive in Shehadi's classroom.  According to Principal Williams: Shehadi yelled at the student and told him to leave the classroom; the student argued with Shehadi about leaving; as the student was leaving, Shehadi closed the door; the student pushed the door back; and Shehadi "pushed the door back at the student"; the door hit the student's back and then closed on his fingers, breaking one.

Principal Williams testified that after hearing different versions of the incident from the injured student, Shehadi, and several witnesses, he concluded that "it appeared to be a mistake . . . . that resulted in something bad that happened to a kid."  Principal Williams testified that because Shehadi's "judgment appeared to be prudent for . . . the way things occurred in the classroom regarding the student", he did not believe termination of employment was warranted.

Sanzone testified that as a result of the incident, Shehadi received a thirty-day suspension without pay and a letter of reprimand in his file.  Sanzone testified that the original recommendation was to terminate Shehadi's employment but that Bellevue administrators changed it because:

> he was an outstanding teacher, a good teacher, and they felt that he had no previous counseling memos, no previous history of any kind of performance concerns; and . . . they felt that this was an accident and that because he had no prior incidents, no behavior issues, nothing whatsoever in his file that . . . he should be retained.

Principal Williams testified that despite this incident, he eventually recommended that Shehadi receive tenure because he had "very good relationships with the . . . students" and would "go to their school events on his own time".  Principal Williams testified that he could not recall Shehadi having any attendance or punctuality issues.

## V.    DISCUSSION

### A.    Summary Judgment Standard

Summary judgment is appropriate when there is no genuine issue with regard to any material fact, and the moving party is entitled to judgment as a matter of law.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Stated otherwise, summary judgment is appropriate "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party[.]" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  When deciding a summary judgment motion, the Court must "resolve all ambiguities and draw all factual inferences in favor of the party opposing the motion." *McPherson v. Coombe*, 174 F.3d 276, 280 (2d Cir. 1999).  Where, as here, the nonmovant is proceeding pro se, the court must read that party's papers liberally and interpret them "to raise the strongest arguments that they suggest." *Id.* (citation omitted).

### B.    Election of Remedies

Defendants seek summary judgment dismissing plaintiff's NYSHRL discrimination claim on the ground that it is barred by his election to pursue his claims before the New York State Division of Human Rights.  "By the terms of the statute . . . the NYHRL . . . once brought before the [New York State Department of Human Rights], may not be brought again as a plenary action in another court." *York v. Association of Bar of City of New York*, 286 F.3d 122,

127 (2d Cir. 2002).  Accordingly, defendants are entitled to summary judgment as a matter of law dismissing the cause of action alleging race discrimination in violation of the NYSHRL.

### B.      Notice of Claim and Exhaustion of Remedies

Defendants contend that plaintiff's hostile work environment and retaliation claims must be dismissed because plaintiff failed to file a notice of claim, as required by N.Y. EDUC. LAW § 3813(1),[11] and because he did not exhaust his administrative remedies with respect to those claims.  "Before filing a Title VII claim in federal court, a plaintiff must exhaust all available administrative remedies."  *Hoffman v. Williamsville Sch. Dist.*, 443 Fed.Appx. 647, 649 (2d Cir. 2011) (citing *Deravin v. Kerik*, 335 F.3d 195, 200 (2d Cir. 2003)).  "An allegation not set forth in an administrative charge will be barred as unexhausted unless it is reasonably related to the allegations in the charge."  *Id.* (citing *Williams v. New York City Hous. Auth.*, 458 F.3d 67, 70 (2d Cir. 2006) (per curiam)).  "A new allegation will be considered reasonably related if the administrative charge provided the EEOC with sufficient notice to investigate the allegation."  *Id.*   The facts on which plaintiff bases his hostile work environment and retaliation claims are the same facts contained in the complaint filed with the NYSDHR and EEOC.  Even assuming that plaintiff filed a notice of claim and that he exhausted these claims at the administrative level, defendants are still entitled to summary judgment dismissing both because, for the reasons that

---

[11]Section 3813(1) of New York's Education Law provides that no action "for any cause whatever":

> shall be prosecuted or maintained against any school district [or] board of education . . .or any officer of a school district [or] board of education . . . unless it shall appear by and as an allegation in the complaint or necessary moving papers that a written verified claim upon which such action . . . is founded was presented to the governing body of said district or school within three months after the accrual of such claim.

follow, plaintiff fails to raise a question of fact with respect to either one.

### C.       Title VII - Individual Liability

Title VII provides: "It shall be an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1). Title VII does not apply to individuals, therefore, the Title VII claims against Sanzone and Herr are dismissed.  *Tomka v. Seiler Corp*., 66 F.3d 1295, 1313 (2d Cir. 1995), *abrogated on other grounds by Burlington Ind. v. Ellerth*, 524 U.S. 742 (1998).  "[A]n individual may be held liable", however, "under the aiding and abetting provision of the NYSHRL if [s]he 'actually participates in the conduct giving rise to a discrimination claim.'" *Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 107 n.10 (2d Cir. 2011) (quoting *Tomka*, 66 F.3d at 1317).

### D.       Hostile Work Environment

"In order to establish a hostile work environment claim under Title VII, a plaintiff must produce enough evidence to show that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Gorzynski v. JetBlue Airways, Corp.*, 596 F.3d 93, 102 (2d Cir. 2010) (quoting *Demoret v. Zegarelli*, 451 F.3d 140, 149 (2d Cir. 2006)).[12]  "In considering whether a plaintiff has met this burden, courts should 'examin[e] the totality of the circumstances, including: the frequency of the discriminatory

---

[12] "[C]laims brought under New York State's Human Rights Law are analytically identical to claims brought under Title VII." *Torres v. Pisano*, 116 F.3d 625, 629 n.1 (2d Cir. 1997).

conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with the victim's [job] performance.'" *Rivera v. Rochester Genesee Regional Transp. Auth.*, 702 F.3d 685, 694 (2d Cir. 2012) (quoting *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 745 (2d Cir. 2003)). The Second Circuit has instructed that:

> the "test has objective and subjective elements: the misconduct shown must be severe or pervasive enough to create an objectively hostile or abusive work environment, and the victim must also subjectively perceive that environment to be abusive." *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002) (quotation marks omitted). Of course, "[i]t is axiomatic that mistreatment at work, whether through subjection to a hostile environment or through [other means], is actionable under Title VII only when it occurs because of an employee's ... *protected characteristic*," such as race or national origin.

*Id.* (quoting *Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001) (emphasis added)).

As evidence of a hostile work environment, plaintiff points to defendants': failure to train him sufficiently; unfounded allegation that he let students out of ISS early; criticism of him for speaking with parents of students in his classroom; allegations that he left work early without permission; and failure to respond to his complaints about the number of students in his classroom. Although plaintiff received memoranda[13] and attended meetings regarding his lateness to work as well as other issues regarding his job performance, there is nothing in the record from which a trier of fact could infer that plaintiff subjectively believed the administrators' criticism of his performance or failure to respond to his complaints about the number of students in his classroom, had anything to do with his race. The record indicates that plaintiff did not connect defendants' adverse treatment of him, on a subjective level, to race, until after he was terminated. Additionally, even when viewed in the light most favorable to

---

[13]Plaintiff admitted receiving at least two memorandums, but denied receiving some of the other memorandums District employees purportedly issued to him.

plaintiff, there is no evidence in the record that suggests any of plaintiff's supervisors were critical of his arrival times, interaction with administrators, speaking with parents, or complaints about the number of students in his classroom because of his race.  In the absence of any evidence that defendants mistreated plaintiff because of his race, his hostile work environment claim must be dismissed.

### E.    Termination

Plaintiff asserts that the District's decision not to terminate Shehadi, a white probationary teacher, when contrasted with its decision to terminate him, a black probationary employee, demonstrates that he was terminated because of his race.  "A showing that the employer treated a similarly situated employee differently is 'a common and especially effective method' of establishing a prima facie case of discrimination, but it 'is only one way to discharge that burden.'"  *McGuinness v. Lincoln Hall*, 263 F.3d 49, 53 (2d Cir. 2001) (quoting *Abdu-Brisson v. Delta Air Lines*, *Inc.*, 239 F.3d 456, 468 (2d Cir. 2001)).  A plaintiff in a termination case who seeks to establish his prima facie case in this manner, must show: that he is a member of a protected group; that he was qualified for the position; that he was subject to an adverse employment action; and that a similarly situated employee not in the protected group was not terminated.  *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  The Second Circuit has often emphasized that the burden of establishing this prima facie case in employment discrimination cases is "minimal."  *McGuinness*, 263 F.3d at 53.  The same standard applies to claims of employment discrimination under 42 U.S.C. § 1981.  *See Garcia v. Hartford Police Dep't*, – F.3d –, 2013 WL 309981, at *5 (2d Cir. Jan. 28, 2013) ("For a claim of employment discrimination under 42 U.S.C. §§ 1981 and 1983, we apply the familiar burden-shifting

framework set forth by the Supreme Court in *McDonnell Douglas*") (citing *Back v. Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d 107, 123 (2d Cir. 2004)).

The comparator "'must be similarly situated in all *material* respects'-not in *all* respects" to the plaintiff. *McGuinness*, 263 F.3d at 54 (quoting *Shumway v. United Parcel Service, Inc.*, 118 F.3d 60, 64 (2d Cir. 1997)). "In other words, where a plaintiff seeks to establish the minimal prima facie case by making reference to the disparate treatment of other employees, those employees must have a situation sufficiently similar to plaintiff's to support at least a minimal inference that the difference of treatment may be attributable to discrimination." *Id*.

It is undisputed that plaintiff is black, that he was qualified for the position of teacher's assistant and that he was terminated. A trier of fact could further find that defendant terminated plaintiff after a student was injured in his classroom but that it did not terminate Shehadi, who is white, after a student was injured in his classroom. A trier of fact could therefore conclude that the District treated plaintiff differently because of his race. Defendant argues that plaintiff and Shehadi are not similarly situated because of the differences in, inter alia, their titles, responsibilities, and personnel records. Viewing the facts broadly and in the light most favorable to plaintiff, however, the Court finds that plaintiff's proffer of evidence satisfies his minimal burden of showing a prima facie case.

"By establishing the 'minimal' prima facie case, a plaintiff 'creates a presumption that the employer unlawfully discriminated, and this places the burden of production on the employer to proffer a nondiscriminatory reason for its action." *Id*. at 55 (quoting *James v. New York Racing Ass'n*, 233 F.3d 149, 154 (2d Cir. 2000). Defendant has presented evidence that administrators decided to retain Shehadi after the incident in his classroom because he was an

26

"outstanding teacher" who had "no previous history of any kind of performance concerns", "no prior incidents, no behavior issues" and "nothing whatsoever in his file".  Defendant asserts that plaintiff, in contrast: failed to arrive to work on time; left work early without permission and failed to return; failed to follow administrators' directives; failed to follow proper procedures for reporting a student injury; failed to follow building rules regarding cell phone use; and allowed ISS students to leave early.

Plaintiff contends that defendant's reasons are false, pointing to evidence in the record that although there are two occasions when administrators allege he left work early without permission, he had obtained written approval from Principal Morone-Wilson to leave early on the first occasion, and did not leave early on the second occasion but stayed for the entire staff development day.  Plaintiff further contends that he always endeavored to follow administrators' directives and never let ISS students leave before the designated time.  Plaintiff testified that although Principal Morone-Wilson addressed cell phone use in the May 24, 2007, memorandum, they never had a conversation about that issue.  As for his alleged failure to follow proper procedures for reporting R.A.'s injury, plaintiff relies on the undisputed evidence in the record that R.A. had no visible injury on the day of the incident and that there was no written or formal procedure for reporting a student injury.  Plaintiff has therefore presented evidence from which a trier of fact could find that most of defendant's reasons for terminating him are false.  Plaintiff has not offered evidence, however, from which a trier of fact could find defendant's reasons for deciding to retain, rather than terminate, Shehadi are false.  Nor does plaintiff seriously challenge defendant's assertion that he was late to work on at least two occasions.

The Court nevertheless assumes that the above-referenced evidence, viewed in the light

most favorable to plaintiff, suffices to establish that defendant's reasons for terminating him and retaining Shehadi are false. Accordingly, the next question "'is simply whether the evidence, taken as a whole, is sufficient to support a reasonable inference that prohibited discrimination occurred.'" *McGuinness*, 263 F.3d at 55 (quoting *James*, 233 F.3d at 156). During the administrative hearing, plaintiff's attorney asked what the basis was for his allegation that the District's motivation for terminating plaintiff's employment was racial discrimination. Plaintiff responded:

> Sir . . . it's very clear that I was terminated because of my race. The reason why, you know; it's my belief and to my understanding that another teacher, Mr. [John] Shehadi . . . was involved in a more severe incident that I was in that particular school a year prior to . . . the incident that I was named to be . . . involved in, and received a . . . tap on the wrist - - slap on the wrist. He actually, And, to my understanding did push/shove the student and slam the student's finger in the door, and he received a - - 30 day suspension. Where I, for an incident I had no involvement in, received a dismissal.
> . . . .
>
> I was held to a different standard than Mr. Shehadi. Mr. Shehadi was given a slap on the wrist, a 30-day suspension with his job back; and based on what he did, which was a severe assault on a kid. And me, in my instance, I had nothing to do with the situation and I . . . got dismissed.
> . . . .
>
> And it's also to . . . my understanding that . . . the year I was dismissed that every other teacher and teacher assistant in that . . . particular school which was white received tenure that year.

On the evidence before the Court, no trier of fact could conclude that defendant decided, on the basis of race, to terminate plaintiff's employment. Plaintiff has not submitted any evidence of statements or conduct by the District, the Superintendent, District administrators, Bellevue principals, Bellevue administrative staff, or Bellevue employees, evincing hostile animus on the basis of race. Moreover, plaintiff's statement that "every other [white] teacher

and [white] teacher assistant . . . received tenure that year" is entirely conclusory: he does not identify any of these employees or offer any information about their job performances.[14]  Thus, the Court finds that there is no evidence from which a trier of fact could find that plaintiff was terminated on the basis of his race.

### F.    Retaliation

To make out a *prima facie* case of retaliation under Title VII, a plaintiff must adduce:

> evidence sufficient to permit a rational trier of fact to find [1] that [ ] he engaged in protected participation or opposition under Title VII, [2] that the employer was aware of this activity, [3] that the employer took adverse action against the plaintiff, and [4] that a causal connection exists between the protected activity and the adverse action, i.e., that a retaliatory motive played a part in the adverse employment action.

*Cifra v. General Electric Co.*, 252 F.3d 205, 216 (2d Cir. 2001) (internal quotation marks omitted).  To satisfy the "protected activity" element, the plaintiff must have had a good faith, reasonable belief that he was opposing a prohibited employment practice.  *Kessler v. Westchester Cnty. Dep't of Social Servs.*, 461 F.3d 199, 210 (2d Cir. 2006).  A close temporal relationship between a plaintiff's participation in a protected activity and an employer's adverse action can establish the required causal link for a *prima facie* case.  *See Treglia v. Town of*

---

[14]In his "Addendum and Request" plaintiff states that he has:

> discovered that the Syracuse City School District . . . has used shrewd tactics in cases like . . . Abdul-Raoof Mustafa v. Syracuse City School District, Stephen Jones, Superintendent of Syracuse City Schools, and Sharon Birnkrant; . . . and Freddy Triana v. Syracuse City School District, Brian Noland, just to name a few.  In these cases the [District] somehow got away with their known and unfair treatment of minority employees.

Dkt. No. 22.  Plaintiff's addendum is unsworn and contains no information about these employees, their positions, or whether they were terminated.  Thus, it insufficient to raise a question of fact.

*Manlius*, 313 F.3d 713, 720 (2d Cir. 2002).

Once a plaintiff establishes a *prima facie* case of retaliation, the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for the challenged employment action. *See id.* at 721.  If the defendant meets this burden, the plaintiff must point to evidence that would be sufficient to permit a rational factfinder to conclude that the employer's explanation is merely a pretext for impermissible retaliation.  *See id*.

In the case at bar, there is no evidence that plaintiff engaged in any "protected activity", thus he has failed to establish a prima facie case of retaliation.  To establish a prima facie case, plaintiff must adduce evidence that the adverse actions were in response to "protected activity," which here refers to "action taken to protest or oppose statutorily prohibited discrimination." *Cruz v. Coach Stores, Inc*., 202 F.3d 560, 566 (2d Cir. 2000).  Plaintiff must also offer evidence of defendants' awareness of the protected activity.  *See id*.  Plaintiff does not offer any evidence from which a fact finder could reasonably infer that he engaged in protected activity.  The complaints he relies on as evidence of protected activities concerned having too many students in his classroom, how he was treated, and "lack of[] support" from the building principals. Such complaints could not reasonably have been understood to protest statutorily prohibited discrimination and, thus, do not qualify as protected activity that may give rise to a claim of retaliation.  *See, e.g.*, *Benn v. City of New York*, 482 Fed.Appx. 637, 639 (2d Cir. 2012) (finding that the plaintiff's complaints to his supervisors, which "concerned disputes about the teaching curriculum and his responsibilities, the condescending manner in which one supervisor spoke to him, and a late-night phone call from a supervisor that disturbed his sleep" did not qualify as "protected activity that may give rise to a claim of retaliation.").  Even if plaintiff could establish

30

a prima facie case of retaliation, he failed to adduce any evidence that retaliation was a substantial reason for his termination.

## VI.     MOTION TO APPOINT COUNSEL

Plaintiff requests that the Court appoint counsel to assist him in this case.  "The court may request an attorney to represent any person unable to afford counsel."  28 U.S.C. § 1915(e)(1).  In light of the Court's decision to grant defendants' motion for summary judgment, it need not address plaintiff's request for counsel.  Accordingly, plaintiff's request is denied.

## VII.    CONCLUSION

For the foregoing reasons, it is

**ORDERED** that defendants' motion for summary judgment (Dkt. No. 15) is **GRANTED**; and it is further

**ORDERED** that the complaint (Dkt. No. 1) is **DISMISSED with prejudice**; and it is further

**ORDERED** that plaintiff's request to appoint counsel (Dkt. No. 22) is **DENIED**; and it is further

**ORDERED** that the Clerk of the Court is directed to enter **judgment for defendants** and **close this case**.

**IT IS SO ORDERED.**

**DATED:**  March 13, 2013
            Syracuse, New York

Honorable Norman A. Mordue
U.S. District Judge

31